**In re Janice K. JENNINGS, Debtor.**

**Brandon James Maxfield, Plaintiff,**

v.

**Janice K. Jennings, Defendant.**

**Bankruptcy No. 03–04937–3F1.**
**Adversary No. 03–336.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Sept. 28, 2005.

Richard R. Thames, Jacksonville, FL, for Plaintiff.

Raymond R. Magley, Jacksonville, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This adversary proceeding is before the Court upon the complaint filed by Brandon James Maxfield ("Plaintiff"), seeking a determination pursuant to 11 U.S.C. § 1141(d)(3) that Janice K. Jennings ("Defendant") would be denied a discharge if this case were a Chapter 7 case. A trial of this adversary proceeding was held July 1, 2004. In lieu of oral argument, the Court directed the parties to submit memoranda in support of their respective positions. Upon the evidence presented and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Defendant is the owner of Bryco Arms, a handgun manufacturer. Bryco Arms sells its handguns mainly to B.L. Jennings, a firearms distributor, owned by Bruce Lee Jennings ("Jennings"), Defendant's ex-husband. On April 6, 1994 Plaintiff was injured in an accidental shooting involving a handgun designed by Jennings, manufac-

tured by Bryco, and distributed by B.L. Jennings.

In 2001 Plaintiff initiated litigation against Bryco, B.L. Jennings and Jennings for the injuries he sustained (the "California litigation"). Defendant was also named as a defendant in the California litigation, with the claims against her based on alter ego and fraudulent transfer theories.

On May 13, 2003 the court in the California litigation entered a judgment against Bryco, B.L. Jennings and Jennings in the amount of $21,250,650.31. The trial of the claims against Defendant was set to commence the following day. On May 14, 2003 (the "Petition Date"), Defendant filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The only reason Defendant filed for bankruptcy protection was because of the California litigation. (Tr. at 68.) Besides the potential debt to Plaintiff, Defendant's only other unsecured debt was ·a $1,000.00 disputed medical bill. (Tr. at 66–68.) Defendant filed her bankruptcy schedules and Statement of Financial Affairs ("SOFA") on June 20, 2003. (Pl.'s Ex. 1.) On Item 12 of Schedule B which requires a debtor to list "[s]tock and interests in incorporated and unincorporated businesses", Defendant listed her stock in Bryco. On Item 13 of Schedule B which requires a debtor to list "[i]nterests in partnerships or joint ventures", Defendant indicated none. On Item 17 of Schedule B, entitled "[o]ther liquidated debts owing debtor including tax refunds," Defendant listed a 2002 federal income tax refund, but stated the value as "unknown." On Item 19 of Schedule B, entitled "[c]ontingent and non-contingent interests in estate of a dece-

dent, death benefit plan, life insurance policy, or trust", Defendant indicated none. On Item 19 of Schedule B, entitled "animals", Defendant listed a horse valued at $1,000.00.

On Item 7 of her SOFA, which requires a debtor to list all gifts (other than ordinary and usual gifts to family members aggregating less than $200.00 per family member) made within a year prior to the filing of the petition, Defendant indicated none. On Item 10 of her SOFA, which requires a debtor to list, other than in the ordinary course of business, all other property transferred within a year prior to the filing of the petition, Defendant indicated none. On Item 11 of her SOFA, which requires a debtor to list all financial accounts which were closed within a year prior to the filing of the petition, Defendant indicated none.

Defendant amended her schedules and SOFA on July 14, 2003. (Pl.'s Ex. 2.) The amendments dealt with her claim of exemptions and the list of creditors receiving payments within the 90 days preceding the Petition Date.[1] On September 19, 2003 Plaintiff served a subpoena on Defendant requiring her to produce certain documents at a Rule 2004 examination scheduled for October 2, 2004. (Pl.'s Ex. 28.) Among other things, the subpoena requested the following information:

1. Your federal and state income tax returns for 2000, 2001, and 2002.

10. The titles and registrations to the automobiles, motorcycles, watercraft and aircraft listed on Schedule B of your bankruptcy schedules.

12. All bills of sale, receipts or other documents relating to your disposition

---

1. The attachment to the amended SOFA indicates that Defendant issued a check to Bank One for $19,300.00 on May 12, 2003. The check was for the purchase of three cashier's checks, one of which was for $18,000.00 to pay Defendant's May, 2003 Citibank Visa bill. (Def.'s Exs. 10, 34.)

or sale of any automobiles, watercraft, aircraft or motorcycles since January 1, 2002.

25. All documents reflecting your ownership or disposition of your interests in the following items:

(i) Shining Star Investments, LLC;

(vii) Eaton Vance accounts;

(ix) A beneficial interest in the Janice K. Jennings Phoenix Trust, which itself is a stockholder in Phoenix Arms, another gun manufacturer.

29. A copy of the Janice K. Jennings Phoenix Trust trust agreement and all documents reflecting your resignation as a trustee of that trust.

30. All documents reflecting the disposition of the assets of the Janice K. Jennings Phoenix Trust.

At Defendant's Rule 2004 Examination, Plaintiff's attorney asked Defendant whether she was entitled to a tax refund for her 2002 federal income taxes. Defendant testified that she was entitled to a refund of approximately $42,000.00 but had not yet received it. (Pl.'s Ex. 4 at 102.) On that same day Defendant again amended her schedules and SOFA. (Pl.'s Ex. 3.) Defendant's amended schedule B disclosed her interest in the following: 1) Item 12–Stock in Cadence Corp.; 2) Item 13–Shining Star Investments, LLC; 3) Item 19–Janice K. Jennings Phoenix Trust; 4) Item–29 a horse and 3 calves, valued at $1,200.00.[2] Defendant's second amended SOFA reflects the following changes: 1) Item 7 indicates that Defendant gave her son a 1997 Chevrolet Pickup during 1999 but formally transferred title to the vehicle on May 1, 2003; 2) Item 7 also indicates that Defendant gave her daughter a 1992

Chevrolet Pickup during 1999 but formally transferred title to the vehicle on October 29, 2002; 3) Item 10 indicates that Defendant sold a vehicle to a friend during May 2003 for $2,500.00; and 4) Item 11 indicates that on May 9, 2003 Defendant closed an Eaton Vance account which contained $83,406.83. Defendant did not amend her schedules to list the amount of the 2002 federal tax refund.

### Cadence Corporation

Cadence Corporation was an Oregon corporation which Defendant set up to purchase vehicles. Defendant testified that Cadence's sole act was the purchase of one vehicle in 1995 and that Cadence never held anything else and never filed any tax return. (Pl.'s Ex. 4 at 81.) "It just, I thought, just sort of dissolved and went away." (Tr. at 21.) Defendant testified that she had not heard of Cadence for years prior to the Petition Date and thought it no longer existed.[3]

### Shining Star Investments, LLC

Shining Star Investments, LLC ("Shining Star"), is a Texas limited liability company which was formed on February 12, 1999. (Pl.'s Ex. 17.) On the Petition Date Defendant owned 100% of the membership interests therein. Prior to the Petition Date and the date the original schedules and SOFA were filed, Defendant had not used Shining Star for any purpose. Shining Star had never had a bank account, had never owned any assets, had never operated a business, and had never earned any income. Shining Star's only expense was a $150.00 annual renewal fee. (Tr. at 89–91.)

Defendant testified that she did not list Shining Star on her original Schedule B

---

2. Because Defendant had already listed and valued the horse at $1,000.00 on her original schedule B, the Court finds that Defendant valued the calves at $200.00.

3. The Court notes that it observed Defendant's demeanor at trial and found her to be a credible witness.

because "[it] didn't occur to me to list it. I'd never done anything with it other than pay that yearly fee. Again, it never had a checking account, bank account, savings, credit cards, any business activity whatsoever in it, and I just didn't think of it." (Tr. at 93–94.) During 2002, Defendant disclosed her ownership interest in Shining Star to Plaintiff in the California litigation. (Tr. at 91–92, 95–96; Pl.'s Ex. 17; Def.'s Ex. 39.)

### Janice K, Jennings Phoenix Trust

On the Petition Date, Defendant was the beneficiary of the Janice K. Jennings Phoenix Trust (the "Phoenix Trust"). The Phoenix Trust owns 100 shares or approximately 11% of the outstanding stock of Phoenix Arms, a firearm manufacturing company located in Ontario, California (Pl.'s Ex. 12; Tr. at 26.) Defendant received a $7,363.00 distribution from the Phoenix Trust in 2001 at which time the trustee informed her she would probably not receive any more distributions because Phoenix Arms was not doing well and it would eventually probably close down. (Pl.'s Ex. 6; Tr. at 101–102.) In 2002 Phoenix Arms yielded a loss of which $3,187.00 was passed through to Defendant and reported on her individual tax return filed in August of 2003. (Plaintiff's Ex. 7.) Defendant testified that she believes the trustee is required to liquidate Phoenix Arms because the total net income for the 100 shares of Phoenix Arms common stock was less than $10,000.00 for two consecutive years. (Tr. 100–102; Def. Ex. 25,

paragraph 11) Defendant does not expect to receive any money if Phoenix Arms is liquidated. (Tr. 103; 111) Defendant testified that she did not intentionally omit her interest in the Phoenix Trust on her original Schedule B but rather overlooked it. (Tr. at 103.) Defendant disclosed her ownership interest in the Phoenix Trust/Phoenix Arms in the California litigation. (Tr. at 103–106.)

### Eaton Vance Account

Prior to the Petition Date, Defendant had an account at Eaton Vance (the "Eaton Vance Account"). As of May 9, 2003 the total balance in the Eaton Vance Account, which was comprised of three mutual funds, was $90,726.00. (Def.'s Ex. 7.) On May 9, 2003 Defendant sold all of her shares in the Eaton Vance Account. As a result of this transaction, the Eaton Vance Account had no value on the Petition Date.[4]

Prior to the Petition Date, Defendant had a checking and savings account at Bank One. On May 12, 2003, Defendant deposited the $90,726.00 in proceeds from the Eaton Vance Account into her Bank One checking account.[5] (Tr. at 70–71; Def.'s Exs. 8, 9.) As with the business interests, Defendant testified that her failure to list the closing of the Eaton Vance account was an oversight, that she overlooked it because it didn't have any value and the money had been transferred to the Bank One account. In response to discovery requests in the California litigation,

---

4. On her second amended SOFA, Defendant mistakenly listed the final balance in the account as $83,406.83. Defendant testified that the real balance was $90,726.00 but she mistakenly listed it as $83,406.83 because that was the balance shown on the quarterly statement ending March 31, 2003. The difference between the two amounts is the increase in value from March 31, 2003 until the time the shares were sold on May 9, 2003. (Tr. at 65–66.)

5. Other than alleging that Defendant pre-paid a Citibank Visa bill with $18,000.00 of the funds deposited into the Bank One Checking account, Plaintiff does not allege that Defendant failed to account for the funds. Defendant introduced a copy of her May 29, 2003 Citibank Visa statement. (Def.'s Ex. 10.) The statement reflects that the charges which Defendant paid were pre-petition charges.

Defendant produced Eaton Vance account statements to Plaintiff's attorney. (Tr. at 68–69.)

### Vehicle Transfers

Defendant testified that she did not list the gifts of the vehicles to her son and daughter on her original schedules because she not think of the transfers of title as a "change of anything". (Tr. at 43.) She believed the vehicles had belonged to her children for several years. (Id.) Defendant did not consider herself the owner of the vehicles because her children had possession of them and drove them. (Tr. at 113–114.) Defendant testified that the friend to whom she sold the 1987 Pontiac had been asking to buy the vehicle for some time. Defendant looked up the value of the Pontiac in the Kelly Blue Book, which indicated that the car was worth between $2,000.00 and $3,000.00 Defendant deposited the $2,500.00 sales proceeds into her Bank One checking account on May 12, 2003. (Def.'s Ex. 8.)

### Calves

Defendant testified that she didn't know why the calves weren't listed on her original schedules because she remembered telling the very first bankruptcy person she spoke to about them. She identified this person as the "accountant for the bankruptcy case." (Tr. at 46.)

### CONCLUSIONS OF LAW

The complaint is predicated on 11 U.S.C. § 1141(d)(3), which provides:

(3) The confirmation of a plan does not discharge a debtor if-

(A) the plan provides for the liquidation of all or subsequently all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1143(d)(3).

Since a plan of reorganization has not yet been proposed, this adversary proceeding seeks solely a determination that Defendant would not be eligible for a discharge under § 727(a)(4)(A) of the Code if this were a Chapter 7 case based on her failure to disclose her business interests in Cadence Corporation, Shining Star and Phoenix Arms. However, Plaintiff also asserts that "[t]he question in this adversary proceeding is whether [Defendant]'s failure to disclose her interests in Phoenix Arms, Cadence or Shining Star, coupled with her general disregard of her duties to disclose transfers to insiders, closed bank accounts and other assets, constitutes a knowing or fraudulent oath sufficient to deny her discharge under § 727(a) or § 1141(d)(3) of the Code."

 The Bankruptcy Code favors discharge of the honest debtor's debts and provisions denying this discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. See Cohen v. McElroy (In re McElroy), 229 B.R. 483, 487 (Bankr. M.D.Fla.1998). However, there are limitations on the right to a bankruptcy discharge. Federal Rule of Bankruptcy Procedure 4005 provides that the initial burden of proof on an objection to discharge lies with the plaintiff. Fed. R.Bankr.P. 4005. However, once a plaintiff meets the initial burden, the debtor has the ultimate burden of persuasion. See Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 619 (11th Cir.1984). That is, the debtor must bring forth "enough credible evidence to dissuade the court from exercising its discretion to deny the debtor's discharge based on the evidence

presented by the objecting party." *Law Offices of Dominic J. Salfi, P.A. v. Prevatt (In re Prevatt)*, 261 B.R. 54, 58 (Bankr.M.D.Fla.2000).

Section 727(a)(4)(A) provides:

(a) The court shall grant the debtor a discharge, unless——

(4) the debtor knowingly and fraudulently, in or in connection with the case——

(A) made a false oath or account;

11 U.S.C. § 727(a)(4)(A).

■ Section 727(a)(4)(A) requires a court to find that the debtor knowingly made a false oath that was both fraudulent and material. *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir.1991). A creditor objecting to discharge pursuant to § 727(a)(4)(A) has the burden of producing sufficient evidence to "give rise to a reasonable inference that the debtor failed to disclose information with the intent to hinder the investigation of the trustee and creditors." *Prevatt*, 261 B.R. at 59. The burden then shifts to the debtor to overcome the inference with credible evidence. *Id.* For a false oath to be considered material, it must be shown that it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik*, 748 F.2d at 618 (citations omitted).

■ Although a single omission is generally insufficient to support an objection to discharge, a series of omissions may create a pattern which demonstrates the debtor's reckless disregard for the truth. *Jones v. Phillips (In re Phillips)*, 187 B.R. 363, 370 (Bankr.M.D.Fla.1995) citing *In re Clawson*, 119 B.R. 851 (Bankr.M.D.Fla. 1990). From this pattern of behavior, fraudulent intent may be presumed. *See id.* citing *In re Sausser*, 159 B.R. 352 (Bankr.M.D.Fla.1993).

■ The Court finds that Defendant's: 1) failure to list her business interests in Cadence Corporation, Shining Star and Phoenix Arms; 2) her failure to disclose the closing of the Eaton Vance Account; 3) her failure to disclose the vehicle transfers; and 4) her failure to list the calves are material. However, to the extent that Plaintiff produced sufficient evidence to give rise to an inference that Defendant failed to disclose the information with the intent to hinder creditors, Defendant brought forth enough credible evidence to dissuade the Court from exercising its discretion to deny Defendant's discharge. Additionally, although Defendant omitted a number of items from her schedules, the Court finds the omissions to be the result of inadvertence and oversight rather than reckless disregard for the truth.

Defendant testified that when she was completing her schedules and SOFA, she did not think to list the three business entities and the closing of the Eaton Vance account. The Court finds Defendant's explanation to be satisfactory for the following reasons. Cadence Corporation's sole act was the purchase of a vehicle. Defendant had not heard of Cadence for years leading up to the Petition Date and thought it no longer existed. Shining Star had never had a bank account, had never owned any assets, had never operated a business, and had never earned any income. Defendant had not received a distribution from the Phoenix Trust since 2001 and was told at that time that she probably would not receive any more distributions from the Phoenix Trust because Phoenix Arms was not performing well and would probably close down. Defendant did not think to list the Eaton Vance Account because it did not have any value and the proceeds from the sale of the funds had been transferred to the Bank One account. Moreover, the Court finds

that given the particular circumstances of this decidedly two-party dispute, the second party being a particularly diligent creditor, Defendant's pre-petition disclosure of her interest in Shining Star, the Phoenix Trust, and the Eaton Vance account militates against an inference that Defendant intentionally omitted such items from her bankruptcy schedules or SOFA.

The Court finds that Defendant did not fraudulently or intentionally fail to list the transfers of the three vehicles on her SOFA. The Court finds credible Defendant's explanation that she didn't think to list the transfers of the titles of the vehicles to her children as gifts during the year leading up to the Petition Date because she believed the vehicles had belonged to her children for several years. Additionally, Defendant's sale of the 1987 Pontiac for what appears to be fair market value, coupled with the deposit of the proceeds thereof into Defendant's Bank One checking account, leads the Court to conclude that the failure to list the sale was an oversight rather than an intentional omission. The Court finds the omission of the calves to be inadvertent. Finally, with respect to the 2002 federal income tax refund, the Court finds that Defendant fulfilled her obligation when she indicated on her original schedules that she was entitled to a refund. At that point Defendant's creditors were on notice that Defendant was entitled to a refund and could inquire further if they so chose.[6]

## CONCLUSION

The Court finds that Defendant's bankruptcy schedules and SOFA omitted a number of material items. However, to the extent that Plaintiff produced sufficient evidence to give rise to an inference that Defendant failed to disclose the information with the intent to hinder creditors, Defendant brought forth enough credible evidence to dissuade the Court from exercising its discretion to deny her discharge. The Court finds the omissions to be the result of inadvertence and oversight rather than fraud or reckless disregard for the truth. Accordingly, the Court would not deny Defendant's discharge pursuant to 11 U.S.C. § 727(a)(4)(A) if this were a Chapter 7 case. The Court will enter a separate judgment in accordance with these Findings of Fact and Conclusions of Law.

---

6. Plaintiff so chose and discovered the amount of the refund at the October 2, 2003

Rule 2004 Examination.